# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **3:21-CR-243** |
| **v.** | : | **(JUDGE MANNION)** |
| **ROLANDO MARTIN HORSFORD,** | : | |
| **ALFRED STEVEN SINGLETON, JR.,** | | |
| **Defendants** | : | |

## MEMORANDUM

Pending before the court are defendants Rolando Martin Horsford's and Alfred Steven Singleton, Jr.'s motions to suppress evidence pursuant to Fed.R.Crim.P. 12(b). (Docs. 45, 47 & 49). Also pending is the motion of Singleton to sever his trial from Horsford's trial under Fed.R.Crim.P. 8 and 14. (Doc. 51). Defendants are charged with a drug trafficking conspiracy in violation of 21 U.S.C. §846. The drug evidence was seized on May 28, 2020, after Pennsylvania State Police ("PSP") troopers executed a traffic stop for speeding and failing to have an operable license plate light, at about 1:23 a.m., on a 2010 Infiniti vehicle driven by Horsford on Route 80 West in Tobyhanna Township, Monroe County, PA. Singleton was a front seat passenger in the vehicle. After the traffic stop and extensive questioning, at 1:40 a.m., Horsford refused the request of the troopers to consent to a search of his vehicle, and the troopers called for the PSP Drug Detection Canine Unit to come to the scene. About 65 minutes after the initial stop, and 47

minutes after troopers called for the canine unit, Corporal Anthony Doblovasky and certified drug detection dog Molly arrived at the scene. Singleton and Horsford were arrested when the troopers discovered cocaine and fentanyl during a search of the trunk after a canine sniff of the vehicle's perimeter. The defendants were arrested and based upon the drug seizure, troopers subsequently obtained a search warrant for the defendants' cell phones found in the vehicle.

Defendants seek the court to suppress the drug evidence obtained from the vehicle alleging that it was obtained unlawfully under the 4th Amendment. Defendants contend that the evidence was obtained unlawfully since the troopers did not have reasonable suspicion to search Horsford's vehicle and that the troopers' use of a canine unit unconstitutionally prolonged the stop, in violation of their 4th Amendment rights.

For the reasons discussed below, after conducting an evidentiary hearing, and after consideration of the briefs and the evidence submitted, including the audio/video dash-cam recording of the defendants' traffic stop, the motions to suppress of both defendants will be **GRANTED**, and the drug evidence obtained from Horsford's trunk will be suppressed since it was only discovered when troopers went significantly "off mission" after the initial traffic stop. Singleton's second motion to suppress the evidence obtained

from the cell phones seized from both defendants will also be granted since this evidence was obtained as the proverbial fruits of the poisonous tree.[1]

## I.      PROCEDURAL BACKGROUND

Defendants Alfred Steven Singleton, Jr, (hereinafter "Singleton"), and Rolando Martin Horsford, a/k/a "Doe," (hereinafter "Horsford"), were arrested at the scene of a traffic stop by PSP troopers in the early morning hours of May 28, 2020, after a warrantless search of Horsford's car revealed drugs in the trunk. Both defendants were then detained in custody. On August 31, 2021, a federal grand jury returned a two-count indictment charging defendants with violations of 21 U.S.C. §846, conspiracy to distribute and possess with intent to distribute 40 grams or more of a mixture or substance containing a detectable amount of fentanyl and additional quantities of cocaine and methamphetamine, from on or about April 26, 2020, and continuing to on or about June 25, 2020, and with violations of 21 U.S.C. §841(a)(1), and 18 U.S.C. §2, possession with intent to distribute 40 grams or more of a mixture or substance containing a detectable amount of fentanyl, and an additional quantity of cocaine. (Doc. 1).

---

[1] The court will address Singleton's motion to sever his trial from Horsford's trial by a separate Memorandum, if necessary, after the government determines whether it will proceed with the charges against both defendants without the benefit of the illegally obtained drug and cell phone evidence which is being suppressed.

On September 23, 2021, Singleton appeared before Judge Saporito for arraignment and he pled not guilty to the charges. (Doc. 17). On October 19, 2021, Horsford appeared before Judge Saporito for arraignment and he also pled not guilty to the charges. (Doc. 31).

On January 30, 2022, Horsford filed, through his counsel, a motion to suppress evidence and a brief in support. (Docs. 45 & 46). On January 31, 2022, Singleton filed, through his counsel, two motions to suppress evidence and briefs in support, as well as Exhibits. (Docs. 47-50, 53). The motions to suppress of both defendants pertain to the suppression of the drug evidence seized from the traffic stop. The second motion filed by Singleton seeks to suppress the evidence obtained from the defendants' cell phones seized at the traffic stop as alleged fruits of an unlawful search. On the same day, Singleton also filed a motion to sever his trial from Horsford's trial, as well as a brief in support. (Docs. 51 & 52).

After being granted an extension of time, the government filed its opposition briefs to all of the defendants' pre-trial motions on February 28, 2022. (Docs. 56-59). The government also submitted Exhibits, including the PSP search warrant application for defendants' cell phones, the affidavit of probable cause and authorization, (Doc. 57-1), the certificate of Detection Canine Handler Training for Doblovasky and Drug Detector Dog Certification for canine Molly, as well as USB Smartcards with the dash-cam audio/video recorded traffic stop of the defendants. (Docs. 60-63).

Singleton filed his reply briefs in support of his three pending motions on March 25, 2022. (Docs. 67-69).

The court conducted an evidentiary hearing on May 9 and 10, 2022. (Docs. 74 & 75). At the hearing, PSP Trooper George Tessitore and Corporal Anthony Doblovasky testified and Exhibits were admitted into evidence. Also, relevant portions of the "Mobile Video Recorder" ("MVR" or "dash-cam") video from Trooper Tessitore's patrol car were played during the hearing.

## I.   FACTUAL BACKGROUND[2]

On May 28, 2020, in the early morning hours, at approximately 01:23 a.m., PSP Trooper Tessitore was in a marked Ford Explorer patrol car that was stationary in the median, perpendicular to and looking into, the west bound lane of Interstate Rt. 80 in Monroe County, Pennsylvania not far from the New Jersey border. The non-emergency lights and forward looking LED white spotlights on the patrol vehicle's roof mounted light bar were on the westbound lane of traffic. No radar was being used, rather they were using

---

[2] The court notes that for present purposes it bases the factual background of this case on the briefs of the parties, the Exhibits, the hearing testimony, as well as the dash-cam video recording of the May 28, 202 traffic stop. (*See also* search warrant affidavit of probable cause, Doc. 57-1, and government hearing Exhibit 2, PSP criminal complaints and related documents regarding both defendants). Also, the government and Singleton submitted to the court binders containing their respective hearing Exhibits.

The court also notes that all of the times stated herein are approximate times based on the dash-cam video and are during the early morning hours of May 28, 2020.

the spotlights to allegedly look for equipment violations, heavy window tinting, or similar potential violations. The vehicle in question had no dark tinted windows or other apparent equipment violations. The trooper could see into the driver's compartment and confirmed that the driver was a black male, the trooper was not sure if he identified a passenger in the vehicle at that time. PSP Trooper Brandon King was also present in the vehicle. Both troopers were in full uniform and they were observing traffic as part of their patrol duties. According to Tessitore he observed a white Infiniti G37 sedan, with temporary New Jersey registration number 630245R pass his location while appearing to be going in excess of the 65 m.p.h. speed limit, however the radar unit was not being deployed at the time. Upon seeing the lit patrol car Tessitore testified that the white Infiniti made a quick, unsafe lane change, and cut in front of a tractor trailer which was also travelling West on Route 80.

Tessitore pulled from the median and proceeded west on Route 80 and observed that the white Infiniti had a non-functioning registration plate lamp. Tessitore then followed the white Infiniti and was able to "clock" it going at a speed of 73 m.p.h. in a posted 65 m.p.h. zone. Tessitore's patrol car was equipped with a dash-cam, and Tessitore activated the dash-cam, which first started recording at 01:22:10 a.m., on May 28, 2020. As Tessitore followed the white Infiniti, the driver activated the brakes to slow the car. (01:22:50 a.m.). Tessitore then activated his emergency lights and initiated a traffic stop of the white Infiniti based on his clocking the vehicle as speeding and

6

based on the inoperable license plate light. The Infiniti immediately pulled over to the off-ramp of Route 80 West at Exit 284, in Tobyhanna Township, Monroe County, Pennsylvania.

At 01:23:35 a.m., Tessitore exited his patrol car and, for safety reasons, approached the Infiniti on the passenger side. Also, as a safety precaution, King followed behind Tessitore. The bright lights of the patrol vehicle were left on and completely illuminated the scene. Both troopers also had their flash lights on and as they were approaching the Infiniti, they appeared to be conducting a safety check of the area and inside the windows of the vehicle. At the hearing, Tessitore testified that there were no weapons or any contraband in plain view inside the vehicle. Tessitore identified himself and observed Horsford seated in the driver's seat and Singleton seated in the front passenger seat. At the hearing, Tessitore correctly identified the two male African American defendants as Horsford and Singleton. There were no other passengers in the. Tessitore asked Horsford for his driver's license and asked if the Infiniti was his car. (01:23:38 a.m.). Horsford indicated that he owned the car and provided Tessitore with a valid temporary New Jersey vehicle registration and his Virginia driver's license.

At 01:23:47, Tessitore informed Horsford the reason for the stop, namely, he was clocked going in excess of the posted speed limit, he cut off the tractor trailer when passing it and, the rear license plate was not illuminated as required. Horsford tried to explain his speed by stating that he was trying to get around the tractor trailer. Horsford also responded "ah, ok,"

7

when he was informed about the need to illuminate his rear license plate. At this time, Tessitore stated that the passenger Singleton was staring, "locked" looking forward, and would not make eye contact with him. However, no questions were asked of Singleton by either trooper and he was not involved in the conversation between Tessitore and Horsford. Nor was Singleton in violation of any law.

Tessitore testified that based on his experience and extensive training, including drug interdiction training on how to develop reasonable suspicion relating to traffic stops, (which were detailed in his resume), Route 80 is a known "drug corridor" for transporting illegal drugs between states, and that temporary registration plates on vehicles are "common for drug trafficking" since they can be counterfeited.

After receiving Horsford's license and registration, Tessitore asked him if he lived in Virginia, and he responded that he did. Tessitore also noticed on the registration that the Infiniti had been purchased in New Jersey on May 24, 2020, technically four days prior to the traffic stop, (as it was now past midnight on May 28), and asked Horsford about the purchase. At 01:24:18 a.m., Horsford explained to Tessitore that, "I just got the vehicle", and added, "it was a couple of days ago." Tessitore testified that he thought this was suspicious that Horsford did not state the exact day he bought his car and apparently believed that the difference between "a couple of days ago" and three to four days ago was indicative of falsehood. In any event, Tessitore admitted that Horsford also told him to check the registration for the car

8

purchase date and that the date was contained on the registration. Tessitore also testified that, for some reason seeing a temporary New Jersey registration tag on a vehicle raised his suspicion, however, when he actually checked the registration document he confirmed that it was valid.

At 01:24:25 a.m., (about 2 minutes into the stop), Tessitore explained to Horsford that he was not going to get a ticket and that he was only going to get a warning regarding his violations for speeding, inoperable registration plate light, and for cutting off the tractor trailer. During the entire time of Tessitore's discussion with Horsford, Tessitore was standing at the passenger side front window and King was standing behind him, and both troopers had their flash lights on. Tessitore directed Horsford to exit his car and accompany him back to the passenger side of the patrol car, ostensibly to obtain information from Horsford to issue the warning. (01:24:30 a.m.). King remained by the front passenger side window of Horsford's car and then began to question Singleton, who remained seated in the car. There is no recording of this conversation.

After Horsford was told to exit his car, Tessitore asked him if he had any weapons, to which Horsford responded that he did not, and then the trooper stated to Horsford, "can you lift your shirt". Horsford complied with the directive and lifted up his shirt exposing his bare stomach and back area and, turned around. Tessitore then physically raised the shirt up so that he could see Horsford's entire waistband. Horsford did not have any weapons,

and Tessitore then told him to go to the front passenger side window of his patrol car.

At 01:25:12 a.m., Tessitore apparently began to type information regarding Horsford and his vehicle into his patrol car's computer in order to complete the issuance of the warning. Tessitore also began to question Horsford on matters that were not related to the ordinary mission of issuing a warning for a marginal speeding violation and having a faulty license plate light. Specifically, some of the "off-mission" questions Tessitore asked Horsford, after he was directed to exit his vehicle, are as follows:

At 01:25:16 a.m., he asked where Horsford was going at that time, to which Horsford responded that he was going to his cousin's house (indicating Singleton) and then going home. Trooper Tessitore then asked what city they were going to? Horsford stated, "I think it's something like Tamaqua, or something like that." (01:25:38). Trooper Tessitore then inquired if Horsford had ever been to Tamaqua before and Horsford responded, "I've been through there."

At 01:26:12, Trooper Tessitore further inquired where Horsford had been earlier that day. Horsford answered, "with my cousin and stuff." (01:26:19). Trooper Tessitore then repeated the question to which Horsford responded, "Dover, New Jersey," and correctly indicated that was where the car was from. Horsford repeated that he lives in Virginia and that he was in New Jersey with Singleton and that he was taking Singleton back to Pennsylvania.

10

At 01:27:10, Horsford further stated that he had been in New Jersey a "couple of days" and that he had bought the car two days ago but that he couldn't remember the exact date. Horsford further claimed that he had bought the car "somewhere close to Dover." Trooper Tessitore had observed that the vehicle had been purchased on May 24, 2020, not two days earlier as claimed by Horsford. Throughout the interaction with Horsford, Trooper Tessitore also stated that Horsford exhibited large amounts of "uh" and "um" answers. Trooper Tessitore testified that he perceived Horsford as providing deceptive answers. Furthermore, Trooper Tessitore testified he believed that the Tamaqua, Pennsylvania area was a low-income area with high narcotics activity.

At 01:27:40, Trooper Tessitore asked Horsford where he had stayed in New Jersey and Horsford responded that he stayed at a hotel, without providing any further details, and then stating that it was a "Marriot, or something like that."

At 01:27:48, Horsford further explained that he was going to the Tamaqua area because his cousin, again indicating Singleton, stays out there. Horsford further explained that he and Singleton were going to Tamaqua and that he was going to stay there with Singleton before going back to Virginia on Sunday.

At 01:28:30, Horsford stated that he had stayed at the hotel in New Jersey by himself, because Singleton stayed "at a house or something."

11

At 01:30:10, Horsford further stated that he had come up to New Jersey to buy the car on May 24th and that he had hung out with family in the Dover, New Jersey area. When asked how far Tamaqua was from Horsford home in Virginia, Horsford stated approximately four and a half hours. Horsford also stated that his family owns buildings and properties in the Tamaqua, PA, area and that he has been out there before.

At 01:32:14, Horsford clarified that he was up in New Jersey for the car and that Singleton was "up here for a girl or whatever." Horsford further explained that he was doing Singleton a favor by driving him back to Tamaqua from New Jersey, and that he was going to stay in Tamaqua with Singleton and Singleton's girlfriend before going home to Virginia. Tessitore testified that this response raised his suspicions since he did not believe it was consistent with Horsford's early response regarding the sleeping arrangements in New Jersey, in which he stated that he stayed at a hotel by himself while Singleton stayed at a house.

During the questioning, Trooper Tessitore can be heard apparently typing Horsford's and his car's information into the patrol car's computer. At 01:35:00, Trooper Tessitore tells Horsford since the vehicle had temporary tags, he had to run the information by VIN number and make/model of the vehicle.

At 01:35:59, Trooper Tessitore asks Horsford to take a seat on the front bumper of the patrol car so that he could finish preparing the warning. Trooper King then gets into the patrol car and, he and Trooper Tessitore

discuss Singleton's responses to King's interrogation to determine if the two men gave inconsistent answers to their questions and if they disbelieved the responses. There is no audio recording of Trooper King's discussion with Singleton which took place while Singleton was seated in the front passenger seat of the car. However, Trooper King related that Singleton stated he and Horsford were travelling from Ledgewood, New Jersey [3], to Lansford, Pennsylvania, to visit Singleton's sister. Singleton had further informed Trooper King that he was from Dover and that he was getting a ride from Horsford to Lansford. The troopers felt that Singletons' responses were contradictory to Horsford's statements, including his responses about where they were driving from, where the two were going, and why they were going there.

Trooper Tessitore testified that after he realized that Horsford and Singleton had given contradicting answers, he asked Trooper King to further clarify with Singleton how Singleton and Horsford met up in New Jersey or if Horsford had picked Singleton up in Pennsylvania. Trooper Tessitore also asked Trooper King to ask Singleton how long he and Horsford had been in New Jersey as well as the relationship between the two men.

At 01:38, Trooper Tessitore indicated that he was still preparing the warning for the traffic stop and asked Horsford if the vehicle was a "two-door sedan" (sic) or a four-door sedan even though by previously standing next to

---

[3] According to Google maps, Ledgewood, N.J. and Dover, N.J. are nearby towns.

the vehicle and presently immediately behind the vehicle in the well-lit area, he could clearly see what type of vehicle it was. These, and similar questions appear nothing more than a thinly veiled ploy to prolong the mission of the traffic stop and give King more time to follow-up alleged discrepancies that were related to the clearly off-mission drug investigation. During this time, Trooper Tessitore also viewed the criminal histories of both Horsford and Singleton from his patrol car's computer which undisputedly had nothing to do with the traffic stop mission of issuing Horsford a warning. Tessitore testified that Horsford and Singleton had extensive criminal histories for drug and narcotics offenses in Pennsylvania, Virginia, New Jersey, and New York. Horford's criminal history showed several arrests in Tamaqua, Pennsylvania, and Tessitore stated that Horsford's previous answers about his ties to the Tamaqua area were, in his opinion, deceptive and intended to minimize his prior criminal history.

At approximately 01:39, Trooper King went back to the patrol car to discuss with Tessitore, Singleton's answers to his follow-up questions, and he relayed the following information: that Singleton and Horsford were best friends and were not related; that Horsford picked up Singleton in New Jersey and that Horsford had been in New Jersey since Monday, but that they did not stay together. Tessitore testified that these answers were contradictory to the answers that Horsford gave him to the same questions, and that Singleton's answers were also contradictory to the vehicle registration, which

14

showed that it had been purchased on Sunday, May 24, 2020, or the day prior to when Singleton said Horsford had come to New Jersey.

At 01:40:30, Tessitore asked Horsford if he would consent to a search of his car. Horsford denied consent and Trooper Tessitore inquired if there was anything illegal in the car, quickly asking if there were different types of controlled substances or other contraband present. Horsford denied that the car contained any illegal items. At 01:41:34, Trooper Tessitore explained to Horsford and Singleton that due to their contradictory answers, he had reasonable suspicion that Horsford's car contained illegal controlled substances and that he was going to call for a canine unit to sniff the car to determine if it contained any illicit drugs. At 01:45:45, Trooper Tessitore advised Horsford and Singleton that a canine unit was on its way to their location. Horsford, Singleton, and Trooper King remained in front of the patrol car and engaged in small talk while they awaited the canine unit.

At 01:56:14, Trooper Tessitore handed Horsford the warning paperwork for the traffic violations, Doc. 76, Sealed Government Exhibit.[4] Despite Tessitore's testimony that the warning included the speeding violation, the registration plate light violation, as well as the violation for cutting off the tractor trailer, the actual warning only included the first two violations, not the reported initial reason why the troopers pulled out and

---

[4]The court notes that during the hearing it directed the government to produce a copy of the warning Tessitore issued to Horsford for the traffic violations, and that the court then filed the warning under Seal since it contained personal identifying information about Horsford. (Doc. 76).

followed the vehicle. Also, it is significant that the time the warning was issued was 01:34a.m., 22 minutes before Tessitore gave Horsford the warning. As discussed below, this delay appears to support the intentional prolonging of the initial traffic stop beyond the reasonable time needed to complete the mission of giving Horsford the warning.

At 02:27 a.m., approximately 64 minutes after the traffic stop began, and 46 minutes after calling for the canine unit, Trooper King explained to Singleton and Horsford that the delay was because there was no on-call canine unit and that the handler had to be woken up, get ready, and then drive to their location. Corporal Doblovasky, the canine handler, was "off duty" at his residence in Luzerne County, PA. Shortly thereafter, Doblovasky and canine "Molly" arrived at the scene.

"Molly" and Doblovasky are certified by the PSP in the detection of the odors of marijuana/hashish, cocaine and cocaine base, heroin and methamphetamine. When Corporal Doblovasky arrived at the scene, he introduced himself to Horsford, and briefly explained what was going to happen. Corporal Doblovasky then deployed "Molly" and conducted "a free air sniff" around the exterior of the vehicle, (02:29). Corporal Doblovasky and "Molly" then conducted a systematic search of the exterior of the Infiniti. During the search, Corporal Doblovasky observed "alert" and "indication" behavior from "Molly" to the open driver door window. This behavior was also observed during the reverse systematic search. Corporal Doblovasky also

16

observed "alert" behavior at other points of the exterior search of the vehicle, including the trunk area.

At 02:33, Corporal Doblovasky informed Trooper Tessitore of the "alert" and "indication" behavior, stating that "Molly" "hit the driver door." Trooper Tessitore then informed Horsford and Singleton of the alert and that he was going to search the vehicle. Trooper Tessitore began to search the driver side door, then began to search the trunk and removed two tape-wrapped plastic bags in the spare tire well of the trunk containing alleged controlled substances. After finding the bags, Trooper Tessitore immediately moved back to the front of his patrol car where he and Trooper King placed Horsford and Singleton in handcuffs. The alleged narcotics were later taken back to the PSP Fern Ridge Barracks, where they were field tested and found to be a presumptive positive for cocaine.

Horsford and Singleton were placed in the rear of Trooper Tessitore's patrol car and taken back to the Fern Ridge Barracks. The Infiniti was later towed to the barracks. A blue Apple Iphone and an Apple iPhone in a "Lifeproof" case, both belonging to Singleton, a LG cellular phone, Motorola cellular phone, and an Apple iPhone belonging to Horsford were also found in Horsford's car and seized.

A state search warrant for the cell phones of the defendants was later obtained by trooper Tessitore. (*See* Doc. 49-3). The probable cause for the search warrant for the cell phones was largely based on the controlled substances found in the trunk of Horsford's car.

On July 9, 2020, the PSP Wyoming Regional Laboratory tested the alleged controlled substances found in the trunk of Horsford's car and determined that the first bag contained cocaine, and the second bag contained fentanyl.

Horsford and Singleton were subsequently charged in state court with the criminal drug offenses. Subsequently, the state charges were dismissed and the cases against both defendants were adopted for federal prosecution. (*See* Doc. 1).

## II.    LEGAL STANDARD FOR SUPPRESSION MOTION

The Fourth Amendment generally requires police to secure a warrant supported by probable cause before conducting a search, unless a recognized exception to the warrant requirement exists. Lange v. California, —— U.S. ——, 141 S.Ct. 2011, 2017, 210 L.Ed.2d 486 (2021).

Protection against unreasonable searches and seizures is enshrined in the Fourth Amendment, which states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

"The Fourth Amendment, like the other Amendments contained in the Bill of Rights, imposes direct limitations on the actions that may be taken by the Federal Government." Adams v. Springmeyer, 17 F.Supp.3d 478, 490

(W.D. Pa. 2014) (citing McDonald v. City of Chicago, 561 U.S. 742, 753-55, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010)). The Fourth Amendment's purpose is to "safeguard the privacy and security of individuals against arbitrary invasions" by the government. Camara v. Mun. Ct. of S.F., 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). For purposes of the Fourth Amendment, a search "occurs when an expectation of privacy that society is prepared to consider as reasonable is infringed." United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). Generally, a search "requires a warrant supported by probable cause." Carpenter v. United States, —— U.S. ——, 138 S.Ct. 2206, 2213, 201 L.Ed.2d 507 (2018) (citing Smith v. Maryland, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)). "Probable cause exists when there is a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." United States v. Davidson, 936 F.2d 856, 859 (6th Cir. 1991) (internal quotations omitted). An affidavit in support of a search warrant "must contain adequate supporting facts about the underlying circumstances to show that probable cause exists." United States v. Weaver, 99 F.3d 1372, 1377 (6th Cir. 1996).

"[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." Minnesota v. Carter, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998). "[U]nder the reasonable expectation of privacy test, the Fourth Amendment protects

against an unreasonable search of an area in which (1) a person exhibits actual, subjective expectation of privacy, and (2) the expectation is one that society is prepared to recognize as reasonable." U.S. v. Ellis, 270 F.Supp.3d 1134, 1140 (N.D. Cal. 2017) (citing Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). "Under Katz, the capacity to claim Fourth Amendment protection does not strictly depend on a property right in the invaded place, but whether the person asserting the claim has a legitimate expectation of privacy." Id. (citations omitted).

"Under the exclusionary rule 'evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.'" United States v. Lara-Mejia, 482 F.Supp.3d 281, 293 (M.D. Pa. 2020) (quoting United States v. Calandra, 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)). "This prohibition also applies 'to the fruits of the illegally seized evidence.'" Id. "The rule operates as 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.'" Id. (citations omitted).

Generally, "the burden of proof is on the defendant who seeks to suppress evidence." U.S. v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995) (citation omitted). "However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." Id. (citation omitted). Stated otherwise, where the search or

seizure was conducted without a warrant, the government "must establish by a preponderance of the evidence when the seizure occurred and that it was supported by reasonable suspicion." U.S. v. Lowe, 791 F.3d 424, 432 n. 4 (3d Cir. 2015). That is, the government then must show that the warrantless search falls within "certain reasonable exceptions." Kentucky v. King, 563 U.S. 452, 459, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011).

## III.    DISCUSSION

This court has jurisdiction over defendants' motions to suppress evidence under 18 U.S.C. §3231. A criminal defendant brings a pre-trial motion to suppress evidence under Fed.R.Crim.P. 12(b)(3)(C), in an effort "to show that evidence against him or her was unconstitutionally obtained." U.S. v. Hernandez, 2015 WL 5123924, at *4 (M.D. Pa. 2015).

Both defendants move to suppress the seized drug evidence found in the trunk of Horsford's car pursuant to a warrantless search by the troopers. They both essentially argue that Tessitore could have completed the mission of the traffic stop sooner and, that the troopers strayed from the lawful traffic stop. Further, defendants contend that the search of Horsford's car trunk was not part of a lawful extension of the traffic stop.

There is no dispute that Tessitore's traffic stop of Horsford was lawful and there was no evidence to contradict Tessitore's testimony that he clocked Horsford travelling at 73 m.p.h. in a 65 m.p.h. zone, and that the

registration plate light on Horsford's car was not operable. Rather, what is disputed between the defendants and the government is whether the troopers unlawfully extended the traffic stop in order to conduct an "off-mission" drug trafficking investigation. Defendants contend that the troopers went off-mission at differing points in the traffic stop. The government contends that the so-called <u>Rodriguez</u> moment occurred at 01:40:30, when Tessitore asked Horsford for his consent to search his car. (Doc. 58 at 43 n. 17). While the court does not concur in the defendants' assessments as to when the troopers went off-mission or with the government's position as to the <u>Rodriguez</u> moment, it does agree with the defendants that the troopers did in fact stray from the lawful traffic stop before Tessitore entered the trunk of Horsford's car and searched it.

Recently, in <u>United States v. Hurtt, 31 F.4th 152, 158-59 (3d Cir. 2022)</u>, the Third Circuit explained:

> A traffic stop, even if brief and for a limited purpose, "constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." Such a seizure does not violate the Fourth Amendment, however, if it is reasonable. A police officer's decision to stop a vehicle is reasonable if he or she "ha[s] probable cause to believe that a traffic violation has occurred." Any subsequent investigation "must be 'reasonably related in scope to the reasons for the stop.'" Even if an officer lawfully stops a suspect at first, "it could become 'unreasonable,' and thus violate the Constitution's proscription [against unreasonable searches and seizures], at some later time." If an extension of a stop prolongs it "beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation," the resulting delay must be supported by reasonable suspicion. When reviewing an allegation that a traffic stop started out properly but later was improperly extended, we "look[] to the facts and circumstances confronting [the officer] to determine whether his or her actions during the stop were reasonable."

In Rodriguez v. United States, the Supreme Court established a test
for judging the lawfulness of an extension of a traffic stop. There, the
Court held that "a police stop exceeding the time needed to handle the
matter for which the stop was made violates the Constitution's shield
against unreasonable seizures." Thus, "a seizure justified only by a
police-observed traffic violation, ... 'becomes unlawful if it is prolonged
beyond the time reasonably required to complete the mission.'"

(internal citations omitted).

The Court in Hurtt, *id*. at 159, then explained that "[a]n unreasonable

extension [of a traffic stop] occurs when an officer, without reasonable

suspicion, diverts from a stop's traffic-based purpose to investigate other

crimes." (citation omitted). At this point, the court must conduct a two-stage

inquiry: 1) "determine [if and] when the stop was 'measurably extend[ed]'";

and 2) "[a]fter determining when the stop was extended—the 'Rodriguez

moment,' [] —[the court] [must] assess whether the facts available ... at that

time were sufficient to establish reasonable suspicion." *Id*. (citation omitted).

Further, "[a]fter the Rodriguez moment, the court cannot consider anything

"later in the stop [to] inform [its] reasonable suspicion analysis." *Id*. (citation

omitted). Thus, the court "ask[s] whether the mission of the traffic stop was

continuously carried out before the discovery of evidence giving rise to a

reasonable suspicion of criminality", and "[a]ny break in that mission taints

the stop because it is the result of an unreasonable delay." *Id*. (citation

omitted).

Additionally, "'unrelated inquiries' resulting in even a *de minimis*

extension [of a traffic stop] are unlawful if not supported by reasonable

23

suspicion", and "[d]etermining the 'relatedness' of any given action to the basic mission of investigating a traffic violation requires assessing whether the action was something ordinarily incident to a traffic stop. *Id*. at 160 (internal citations omitted). Actions normally related to the mission of a traffic stop, include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id*. 160 (internal citations omitted). Further, when conducting on-mission tasks, "[o]fficers should be reasonably diligent," and "the best indication of whether an officer has been reasonably diligent is by noting what the officer actually did and how he [or she] did it." *Id*. at 160 (internal quotations and citation omitted).

In viewing all of the facts and circumstances confronting the troopers in this case, the court finds that their initial traffic stop and investigation into the traffic violations were of dubious origin but none the less lawful. However, once Tessitore told Horsford to leave his car and go to the patrol car, allegedly for purposes of preparing the warning, namely, the Rodriguez moment, the subsequent actions by the troopers diverted to the off-mission task of beginning a drug trafficking investigation. At this point, the stop became unlawful and unreasonably prolonged well beyond the time required to complete the mission of the traffic stop, i.e., to issue the warning.

At the time Horsford was told that he was just going to get a warning, Tessitore directed Horsford to exit his car and accompany him back to the passenger side of the patrol car ostensibly to obtain further information from

24

Horsford to issue the warning. (01:24:30 a.m.). King remained by the front passenger side window of Horsford's car where Singleton was seated and, he began to question Singleton. Even though the conversation was not recorded, there was no evidence or testimony presented that King's questioning of Singleton was related to the traffic stop. Nor does the court find that this questioning was related to the stop since Singleton was only a passenger with no obligation to answer any questions or even speak to the troopers. Further, there was no evidence to show that Singleton was involved with any traffic violation and he was not issued any ticket or warning for any such violation.

After Horsford was told to exit his car, Tessitore asked him if he had any weapons, to which Horsford responded that he did not, and then the trooper stated to Horsford, "can you lift your shirt", to make sure that Horsford was unarmed. After Tessitore was satisfied that Horsford did not have any weapons, and he told Horsford to go to the front passenger side window of the patrol car for the preparation of the warning.

No doubt that "[w]hen evaluating whether an officer was on-mission, [the court] consider[s] the legitimate and weighty interest in officer safety and thus will tolerate additional intrusions, such as forcing a driver to get out of a vehicle", and "[t]his interest, [u]nlike a general interest in criminal enforcement, ... stems from the mission of the stop itself." *Id*. at 160 (internal quotations and citations omitted). Thus, Tessitore was entitled to direct Horsford to get out of his car to make sure he had no weapons, but there

was no evidence presented showing that Tessitore had reason to require Horsford to go to his patrol car in order to prepare the warning. Rather, at this point, Tessitore strayed from the original mission of the traffic stop by separating the defendants in order to begin a drug investigation by questioning them about their activities and looking for inconsistencies in order to create reasonable suspicion to support the resulting delay in the stop and the subsequent canine sniff of Horsford's car. Further, there was no testimony that Tessitore separated the defendants as a safety precaution. Regardless, according to Rodriguez, "'safety precautions taken in order to facilitate' investigation of other crimes are not justified as part of a routine traffic stop." *Id*. (citation omitted). Therefore, at this time Tessitore went off-mission and the court does not find it credible that he required Horsford to go to his patrol car to ask him questions related to the warning, when he had all of the information needed to prepare the warning on his patrol car computer without Horsford's presence. Nor does the court find it credible that Tessitore had to question Horsford about where he was coming from, what he was doing, where he was going, why he was going there, where he was staying and had stayed and when he was leaving, as part of the issuance of the warning. In short, it is disingenuous for Tessitore to testify that the inconsistent answers of the defendants to the troopers' off-mission questions lead to his reasonable suspicion of drug activity, and then to rely upon that suspicion to justify a drug investigation detour from the basic mission of the traffic stop. *See* United States v. Garner, 961 F.3d 264, 271 (3d Cir. 2020)

(Third Circuit held that the Rodriguez moment and the diversion from the traffic stop mission occurred when the trooper asked the driver questions about his employment, family, criminal history, and other questions unrelated to the traffic stop). Tessitore's detour from the lawful inquiry regarding the traffic stop, such as obtaining Horsford's license and registration, and his subsequent detailed questions about Horsford's activities cannot be justified by the reasonable suspicion the trooper then developed by way of his intrusions that were beyond the limitations of the 4th Amendment. At the time the defendants were separated and the individual questioning of them began, neither trooper would have reasonably suspected criminal drug activity. Moreover, simply because the traffic stop was on Route 80, according to Tessitore a known "drug corridor", "obviously does not, without more, justify an otherwise unconstitutional intrusion", and the troopers' presence at that location does not "excuse deviating from the original purpose of the detention." *Id*. (internal citations omitted).

The court finds that after Tessitore had secured the safety of the scene by making sure Horsford was not armed, and then told Horsford to go to the passenger side of his patrol car, instead of allowing Horsford to return to his car seat, this was the time in which the ordinary mission of the traffic stop deviated, (01:24:30), and became the beginning of the off-mission drug trafficking investigation. Although Tessitore did also complete the traffic stop mission by doing such things as checking for insurance, outstanding warrants, and the validity of the registration, he unreasonably prolonged the

stop in order to further delve into the defendants' stories about their activities in an attempt to develop a reasonable suspicion of their involvement with illegal drugs. The completion of the traffic stop mission by Tessitore by preparing the warning clearly could have been completed, (and apparently actually was completed within 11 minutes of the stop according to the time noted on the warning, *see* Doc. 76). Rather, Tessitore directed Horsford to the side of his patrol car to begin an investigation into ordinary criminal wrongdoing, particularly drug trafficking, by unreasonably prolonging the traffic stop. It was at this point, that the troopers deliberately separated the defendants, after the safety of the scene was secured, to question them in order to develop reasonable suspicion for the off-mission drug investigation.

At 1:25:12 a.m., As Trooper Tessitore was inputting the information on the computer for the traffic violations warning, he also began to ask Horsford several questions that were well beyond the ordinary mission of the traffic stop and which clearly lengthened the roadside detention, such as where Horsford had bought the car, how much he had paid for it, where he was going, where he had stayed, who he was going to visit and, where he was going to stay in the Tamaqua, PA, area. The duration of the traffic stop was measurably extended longer than a normal traffic stop due to the extraneous questions Tessitore was asking Horsford that were not related to the issuance of the warning. Further, there was no testimony presented as to why it was necessary for Horsford to exit his car in order for Tessitore to prepare the warning on his patrol car computer. Nor was there any testimony

or evidence that Tessitore needed to ask Horsford any further questions after he obtained Horsford's license and registration. Indeed, from the face of the warning, Doc. 76, it is readily apparent that all of the information needed to issue the warning was contained on Horsford's documents Tessitore already possessed. Rather, in light of all of the circumstances surrounding the traffic stop and the questioning observed by the court from the dash-cam video, it appears that the only reason Tessitore separated the two defendants was to commence the off-mission criminal investigation related to drug trafficking. Also, it cannot be ignored that Tessitore's questioning of Horsford while he was standing by the patrol car did not occur in a vacuum as King was simultaneously questioning Singleton who had no obligation to respond and who had absolutely nothing to do with the mission of the traffic stop or with obtaining any information required for Tessitore to prepare the warning for Horsford.

Then at 01:35:59, Tessitore tells Horsford to take a seat on the front bumper of the patrol car allegedly so that he could finish preparing the warning. However, the warning Tessitore prepared for Horsford was actually already issued at 01:34, *see* Doc. 76, before Tessitore conferred with King regarding the alleged inconsistency of the responses given by the defendants to their questions. The troopers then used this additional time, which according to the record was beyond the time needed for issuance of the warning, in order to compare the answers of the defendants to their off-mission questions and determine if there were inconsistencies to support a

29

reasonable suspicion of illegal drug activity. Tessitore further delayed the traffic stop by telling King to follow up with a few more questions to Singleton out of Horsford's presence, such as their relationship, which clearly continued the detour from any lawful inquiry related to the traffic stop and was done solely to shore up reasonable suspicion of drug activity needed for Tessitore to ask for a consent search of Horsford's car and to then justify his call to the canine unit for a drug sniff of the car. Thus, the court finds that the troopers did not possess reasonable suspicion of criminal drug activity until after they improperly extended the traffic stop, and this constituted a violation of the Fourth Amendment. *See* Garner, 961 F.3d at 271.

Based, in large part, on Hurtt, the court finds that the troopers improperly extended the lawful traffic stop and its mission to investigate the alleged traffic violations. King's questioning of Singleton, after the defendants' separation, had absolutely nothing to do with the initial uncontested purpose of the mission of the traffic stop, i.e., the speeding, registration plate light, and alleged unsafe passing of the tractor trailer violations. Nor was there any testimony or evidence presented that King had to stay by Horford's car to enhance the security of the traffic stop or why Horsford had to be separated from Singleton instead of having him return to his car seat and letting King keep an eye on both men while Tessitore stuck to the mission of issuing a warning. There were no weapons seen by the troopers in plain view in the car and Horsford was not armed. Nor can it be ignored that King did, in fact, leave Singleton in the car unattended while he

and Tessitore compared the answers to their questions for discrepancies that they separately posed to the defendants as part of the drug trafficking investigation. Thus, the court finds that separating the defendants and asking them off-mission questions was not done to ensure the safety of the troopers and was not in any way related to the traffic stop.

"Without reasonable suspicion, an inquiry resulting in an extension of the traffic stop is unlawful if not related to the mission (i.e., off-mission)." *Id.* at 162. Thus, based on the totality of facts and circumstances of this particular case, the court finds that the extension of the traffic stop for the unrelated inquiries conducted by the troopers constituted off-mission activities and were unlawful. As such, the subsequently discovered drug evidence in the trunk of Horsford's car that was obtained by the warrantless seizure of the car, as well as any evidence discovered from the defendants' cell phones that were found in the car, must be suppressed for trial.[5]

## IV.    CONCLUSION

Based on the foregoing, and in light of <u>Hurtt</u>, the court finds that since the controlled substances evidence, as well as any evidence obtained from the defendants' cell phones, "was only uncovered after the [troopers] went off-mission, the [troopers] wrongly extended the traffic stop and violated [the

---

[5]Thus, Singleton's second motion to suppress all of the cell phone evidence, Doc. 49, will also be granted under the fruits of the poisonous tree doctrine.

defendants'] Fourth Amendment right to be free from unreasonable searches and seizures." *Id*. at 163-64. Therefore, the court will **GRANT** the defendants' motions to suppress evidence, **(Docs. 45, 47 & 49)**, and the controlled substances evidence found in Horsford's car, as well as any evidence obtained from the defendants' cell phones, will be **SURPRESSED** for trial. The court will **DEFER** ruling on Singleton's motion to sever his trial from Horsford's trial, **(Doc. 51)**, pending a determination by the government as to whether it will proceed with this case without the stated suppressed evidence.

An appropriate order will be issued.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: June 16, 2022**
21-243-01